(113 N. W. 870.)

---

TORBER NELSON, GAYVE THOMPSON, TORRA SOLUM, CHARLES KITTLESON AND THONE SALEMONSON V. JULIA THOMPSON AND F. R. FULTON.

Opinion filed June 12, 1907.

### Evidence — Opinion Evidence — Sanity.

1. Opinions of witnesses are in general irrelevant. Certain exceptions to this rule, however, exist. Where, for example, the witness is asked to testify from his observation in talking with a person whether in his opinion that person's mind was clear, and whether he was sane or insane.

### Deeds — Capacity to Execute.

2. The test of whether a person is competent to make a deed is that he should be qualified to do that particular business rationally— not on the one hand, that he should be capable of doing all kinds of business with judgment and discretion, nor, on the other, that he should be wholly deprived of reason, so as to be incapable of doing the most familiar and trifling work. *Held*, that the evidence in this case shows the grantor in a deed to have been competent to execute the same.

Appeal from District Court, Grand Forks county; *Fisk*, J.

Action by Torber Nelson and others against Julia Thompson. From a judgment for plaintiffs, defendant appeals.

Reversed, and judgment ordered for defendant.

*Skulason & Skulason* and *Frank B. Feetham,* for appellant.

One who knowingly, though passively, suffers another to purchase and expend money on land, without disclosing his claim, cannot exercise his legal right against such person. Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79; Town v. Needham, 25 Am. Dec. 246; Starrs v. Barker, 10 Am. Dec. 316; Brown v. Bowen, 30 N. Y. 519; Brown v. Bowen, 86 Am. Dec. 406; Anderson v. Hubbell, 47 A. R. 394; Fletcher v. Holmes, 25 Ind. 458; Blair v. Wail, 69 N. Y. 113.

Plaintiff's action is barred by statute of limitations.   Rev. Codes 1899, sections 5207, 5211, 5212; Houts v. Hoyne, 84 N. W. 773; Pollock et al. v. Wright et al., 87 N. W. 584; Wood on Limitations, chapter 6; White v. Sheldon, 4 Nev. 280; Pilcher v. Flinn, 30 Ind. 202.

Where statute of limitations bars the ancestor, it bars the heirs. Wood on Limitation, 9; Uptegrove v. Blum, 10 Atl. 787.

Statute of limitations run against insane persons, unless, it specifically exempts them.   Wood on Limitations, 571; 19 Enc. of Law, 212, 237, 240; Northrop v. Marquam, 18 Pac. 449; Dunham v. Sage, 52 N. Y. 229; Acker v. Acker, 81 N. Y. 145; McNeil v. Sigler, 64 N. W. 604.

*R. M. Carothers* and *Guy C. H. Corliss,* for respondent.

A person without mental capacity cannot contract.   Jackson v. King, 4 Cow. 207; Dennett v. Dennett, 44 N. H. 531; Concord v. Rumney, 45 N. H. 423; Hovey v. Chase, 52 Me. 304, 83 Am. Dec. 514; Sawyer v. White, 122 Fed. 223; Edwards v. Davenport, 20 Fed. 756; Ring v. Lawless, 60 N. E. 881; 16 Am. & Eng. Enc. Law, 1624, 1725.

If the mind does not know what it is doing, it is immaterial what caused the condition or what mentality there is for other purposes. German S. & L. Soc. v. De Lashmut, 67 Fed. 399; Delafield v. Parish, 25 N. Y. 9; Rogers v. Blackwell, 49 Mich. 912, 13 N. W. 512; Van Deusen v. Sweet, 51 N. Y. 378; Griswold v. Butler, 3 Conn. 227; Elder v. Schumacher, 33 Pac. 175; Corbit v. Smith, 7 Iowa, 60; Dexter v. Hall, 15 Wall. 9, 21 L. Ed. 73; Johnson v. Harmon, 94 U. S. 371, 24 L. Ed. 271; Plaster v. Rigney, 97 Fed. 12; Dougherty v. Powe, 30 So. 524; 13 Cyc. 573.

Where the transaction is not a business one, and no real value is received by the lunatic, the deed is absolutely void.   Elliott v. Ince, 7 De. G. M. G. 475, 44 Eng. R. Rep. 186; Wooley v. Gaines, 39 S. E. 892; Riley v. Carter, 25 Atl. 667; Evans v. Horan, 52 Md. 610; Baldwin v. Smyth, 1 Ch. 588; Brigham v. Fayerweather, 144 Mass. 48; 2 Pom. Eq. Jur. 946; Fay v. Burdett, 81 Ind. 433; Lincoln v. Buckmaster, 32 Vt. 652; Halley v. Troester, 72 Mo. 73; Eaton v. Eaton, 8 Am. Rep. 716; Crawford v. Scovell, 94 Pa. St. 48, 39 Am. Rep. 766; Hovey v. Hobson, 53 Me. 451, 89 Am. Dec. 705; Hanley v. Nat. L. & I. Co., 29 S. E. 1002.

. Where there is a consideration and the grantee is innocent, grantor need not restore. Seaver v. Phelps, 11 Pick. 305; Gibson v. Soper, 6 Gray, 279; Hovey v. Hobson, 89 Am. Dec. 708; Crawford v. Scoville, 94 Pa. St. 48; Chew v. Bank, 14 Md. 318.

· Grantor has until recovery of his reason to disaffirm. Boynton v. Reese, 37 S. E. 437; Spicer v. Holbrook, 66 S. W. 180; Downham v. Halloway, 64 N. E. 82; Hull v. Louth, 10 N. E. 270; Boynton v. Reese, 37 S. E. 437.

After grantor's death right is in the heirs. Robers v. Blackwell, 49 Mich. 192; French Lumbering Co. v. Theriault, 83 N. W. 927; Hunt v. Rabitoay, 84 N. W. 59; Burm v. Postell, 33 S. E. 707; 9 Enc. Law, 119, 120.

. Nothing being paid, heirs could evince disaffirmance by bringing suit. Gibson v. Soper, 6 Gray, 279, 280; Hull v. Louth, supra; Valpey v. Rea, 130 Mass. 384; Brigham v. Fayerweather, 144 Mass. 48; Elder v. Schumacher, 33 Pac. 175; Burnham v. Mitchell, 34 Wis. 117; Crawford v. Scoville, 94 Pa. St. 48; Phillips v. Gorham, 17 N. Y. 270; Eaton v. Eaton, 37 N. J. L. 108; Brown v. Freed, 43 Ind. 253; Folsom v. Garner, 15 Mo. 494; Bensell v. Chancellor, 5 Whart. 371; Dexter v. Hall, supra.

Heirs cannot rescind before ancestor's death. Kilbie v. Myrick, 12 Fla. 419; McMillan v. Deering Co., 38 N. E. 398; Baldwin v. Golde, 34 N. Y. Supp. 587; Brigham v. Fayerweather, supra; Riley v. Carter, 25 Atl. 667, 669.

. Where grantor cannot disaffirm, the law will for him. Spicer v. Holbrook, 66 S. W. 180; Brigham v. Fayerweather, supra; Rogers v Blackwell, 49 Mich. 192.

A cloud on title is a continuing wrong and never outlaws: Cameron v. Lewis, 59 Miss. 134; Mut. Life Ins. Co. v. Corely, 7 N. Y. Supp. 939; Quinn v. Kellogg, 35 Pac. 49; Minor v. Beekman, 50 N. Y. 337; Rockwell v. Servant, 54 Ill. 251.

Deed of an insane person is void even against a bona fide purchaser. German S. & L. Soc. v. De Lashmer, 67 Fed. 399; Rogers v. Blackwell, 49 Mich. 192, 194; Somers v. Pumphrey, 24 Ind. 238; More v. Abernethy, 7 Blackf. 442; Gates v. Carpenter, 43 Iowa, 152; Hovey v. Hobson, 89 Am. Dec. 705; Dewey v. Allgire, 40 Am. St. Rep. 468; Valentine v. Richardt, 3 N. Y. Supp. 906; Hull v. South, 10 N. E. 270, 15 N. Y. Supp. 275; Mustard v. Wohlford, 15 Grat. 329, 340 (S. C.); 76 Am. Dec. 209, 213;

Harrod v. Meyers, 21 Ark. 592, 76 Am. Dec. 409; Brantley v. Wolff, 60 Miss. 420; McMorris v. Webb. 17 S. C. 558, .43 Am. Rep. 629; Jenkins v. Jenkins, 12 Iowa, 195, 200; Miles v. Lingerman, 24 Ind. 385; Sims v. Smith, 86 Ind. 577; Buchanan v. Hubbard, 96 Ind. 1; Howard v. Simpkins, 70 Ga. 322; Hill v. Anderson, 5 Sm. & M. 216.

No tender being required, cancellation can be done by suit. Ludington v. Patton, 86 N. W. 571; Vial v. Reynolds, 23 N. E. 301; Berry v. A. C. Ins. Co., 30 N. E. 254; Allerton v. Allerton, 50 N. Y. 670; Gould v. Bank, 86 N. Y. 75; Taylor v. Nat. Bank, 62 N. W. 99; Knappen v. Freeman, 50 N. W. 533; Thrackrah v. Haas, 119 U. S. 499, 30 L. Ed. 486; O'Dell v. Burnham, 21 N. W. 635; Maloy v. Berkin, 27 Pac. 442; Thomas v. Beales, 27 N. E. 1004; Kley v. Healy, 28 N. E. 593.

One defeated in ejectment suit, cannot afterward sue on a different title held at its commencement. Fayerweather v. Ritch, 195 U. S. 276; United States v. Cal. & O. Land Co., 192 U. S. 355; Hoseason v. Keegen, 59 N. E. 627; Wildman v. Wildman, 41 Atl. 1; Breeze v. Haley, 18 Pac. 551; Wolverton v. Baker, 33 Pac. 131; Donnell v. Wright, 49 S. W. 874; Bassett v. Conn. R. Co., 22 N. E. 890; Foster v. Hinson, 39 N. W. 682; Werlin v. New Orleans, 177 U. S. 390; Lamb v. McConkey, 40 N. W. 77; Springer v. Darlington, 64 N. E. 709; Kurtz v. Carr, 5 N. E. 692; Patterson v. Wold, 33 Fed. 793.

A judgment does not bar a title acquired after the action in which it was rendered was begun. 24 Am. & Eng. Enc. Law, 776, 777; People v. Holladay, 27 Am. St. 186; Valentine v. Mahoney, 37 Cal. 389; Bedford, etc., Co. v. Oman, 134 Fed. 64; Teigen v. Drake, 101 N. W. 893; McLane v. Bovee, 35 Wis. 2734; Murray v. Green, 28 Pac. 61; Mitchell v. French, 100 Ind. 334; Morrison v. Beckey, 6 Watts, 349; 1 Van Fleet Former Adjudication, p. 374; State v. McEldowney, 47 S. E. 650; Headley v. Leavitt, 55 Atl. 731; Mershon v. Williams, 44 Atl. 211; Union Term. Co. v. Wilmar & S. F. Ry. Co., 90 N. W. 92; People's Bank v. Hodgdon, 27 Pac. 938.

POLLOCK, District Judge. This action was instituted under the statute to quiet title of the plaintiffs to the N. W. ¼ of section 17, tp. 149 N., range 49 W., of the Fifth P. M. The action was tried by the court, and an appeal taken under section 7229, Rev. Codes 1905, and is before this court for a trial de novo.

Certain facts are undisputed. It is conceded that one Kittel Olson was, prior to the 19th day of December, 1887, the owner in fee of the land in question, and that he died on or about the 2d day of August, 1903, leaving surviving him as his sole heirs at law the five plaintiffs, all of whom, except Thone Salemonson, being children, and Thone Salemonson being at the time of Kittel Olson's death, the sole surviving child of Ole Kittelson, a deceased child of Kittel Olson. The title of the plaintiffs to the land is good as against Julia Thompson, unless an alleged deed claimed to have been executed by Kittle Olson in his lifetime to the son Ole Kittelson in his lifetime, is sustained. The defendant, Julia Thompson, in her answer, by way of counterclaim, sets up and relies on this deed, which is dated December 19, 1887, and claims that the grantee therein, Ole Kittelson, died in December, 1888, leaving him surviving as his sole heirs at law the plaintiff Thone Salemonson and Charles O. Myron, his two children, and that by succession each inherited from their father an undivided half interest in the real estate in question, and that the defendant, Julia Thompson, succeeded to the one-half interest of Charles O. Myron by virtue of an attachment of his interest in the land by Julia Thompson in a suit brought against the said Myron for damages for breach of promise of marriage, and through the sale of said interest by her under execution upon the judgment rendered in such action, upon which sale she herself purchased said interest, and through the final judgment of the Supreme Court judging void as against said Julia Thompson the transfer by Charles O. Myron of his undivided half interest in said land to his sister, the plaintiff Thone Salemonson, previous to the levy of said attachment. For this succinct statement of facts, we are indebted to the valuable brief of counsel for the respondents. For the sake of clearness and for those who do not understand the peculiarities of the Scandinavian manner of giving names, we may say that the ancestor was Kittel Olson, his son was named Ole Kittelson, and his son was named Charles O. Myron. The issues were tried before the court without a jury. The court made his findings of fact, which, in substance, were that the alleged deed from Kittel Olson to Ole Kittelson was entirely without consideration; that the said Kittel Olson had no knowledge of what was taking place when he gave said deed, and was wholly without understanding as to the nature of said transaction, and was at said

time without sufficient understanding to be conscious of his owner-
ship of the said land or the right to dispose of or control the same,
and that the said Ole Kittelson at the time of obtaining said deed
was fully aware of the condition of said Kittel Olson, his father.
Judgment was therefore rendered in favor of the plaintiffs, on
the theory that the deed referred to was void.

This court, after a careful investigation of all the evidence in
the case, has arrived at an opposite conclusion, and must hold that
the deed is valid. Such being the situation, it will be entirely
unnecessary for us to discuss many questions of law which are pre-
sented by counsel for appellant, such as those growing out of
estoppel, laches and res adjudicata, claimed by them to have
existed because, this deed being valid, then it is a conceded fact
and must follow from the whole record that the title of Julia
Thompson to an undivided half interest in the land must be quieted
in her.

1. Preliminary to a short discussion of the evidence, the court
must pass upon the proper admission of certain of the testimony
which was offered by counsel for respondents, and as often ob-
jected to by counsel for appellant. An illustration of the questions
objected to would be the following, taken from the direct examin-
ation by Mr. Corliss, of Tora Solum, found at folio 219 of the
abstract: "Q. From what you saw of your father's conduct after
he had this trouble, and from what you observed about his ab-
sense of speech and answering 'Ya, ya,' and 'Nay, nay,' senseless-
ly at times, and from all that you saw of him at that time, his
conduct and everything else, what is your opinion—I do not ask
you what you know, but what is your opinion as to whether your
father had any idea of business at all?" Mr. Skulason objected to
this line of questioning upon the grounds that it was not competent,
was opinion evidence, irrelevant, immaterial and leading. "There
is no more familiar principle in the law of evidence than that
opinions of witnesses are in general irrelevant, even when wit-
nesses are limited in their statements to facts within their own
knowledge. Their bias, ignorance and disregard of the truth are
obstacles which too often hinder in the investigation of the
truth; but the general rule rejecting evidence as to the opinions
of witnesses is subject to very important exceptions. It often hap-
pens that it is impossible for a witness to detail all the pertinent
facts in such a manner as to enable a jury to form a conclusion with-

out the opinion of the witness. Indeed, the witness might not be able to separate the facts and indications from which he has formed a conclusion from the conclusion itself. Accordingly, a witness may testify to his own state of health. This is not a matter of opinion in the sense that it calls for expert testimony. So ordinary witnesses have been allowed to express opinions as to whether another person seemed to be suffering pain, or whether he seemed nervous or sad, or in pain or good health, or whether a person's mind seemed to be clear or had failed." Jones on Evidence, pars. 361, 362, and cases cited. In the case of the People v. Sanford, 43 Cal. 33, the court, referring to this class of testimony, says: "It approaches knowledge, and is knowledge, so far as the imperfection of human nature will permit knowledge of those things to be acquired, and the result thus acquired should be communicated to the jury because they have not had the opportunities of personal observation, and in no other way can they effectually have the benefit of the knowledge gained by the observation of the others." It would therefore appear that the objection to the introduction of such opinion testimony should be overruled.

2. The question is naturally suggested by the record in this case, in view of the provisions of section 4018 of the Revised Codes of 1905, which declares that a person entirely without understanding has no power to make a contract of any kind, just what those provisions mean when applied to facts like those in the case at bar. We are of the opinion that the rule as laid down in Jackson v. King, 4 Cow. (N. Y.) 207, 15 Am. Dec. 354, is the correct one, viz., that, "upon the question of incapacity to render to deed invalid, they must be satisfied that the grantor was not in a situation to transact that particular business rationally—nor, on the one hand, that he should be capable of doing all kinds of business with judgment and discretion, nor, on the other that he should be wholly deprived of reason, so as to be incapable of doing the most familiar and trifling work, that, if the mind and memory were in such a situation at the time of executing the deed as to render him wholly incompetent to judge of his rights and interest in relation to that transaction, the deed would be void." Counsel for the respondents urge this rule as being the correct one to be applied. We are in perfect accord with him in this contention. They insist that the ancestor, Kittel Olson, was not in a situation to transact the particular business rationally of giving a deed to his son, Ole

Kittleson. But a study of this testimony leads us to the opposite conclusion.

To properly measure the testimony in this case, it will be necessary to take a broad view of the surrounding circumstances. We find a man of fair intelligence, a widower, living with his son, suddenly stricken with paralysis of the body and especially of the face and organs of speech. He was the owner and in possession of a quarter section of land, mortgaged to a certain extent, at a period when there was no great advance in the price of real estate, and long before the great advance which has come to lands in this country during the past 10 years. He permits his children to continue farming the land, everything runs along satisfactorily, and in the course of a few years a deed is given to the son who is then taking care of his father, and the evidence shows that this son agreed to provide his father with his future support in consideration of the deed. The old gentleman lives, regains his powers of locomotion, his ability to visit his neighbors, to receive the communion under the particular solemnities required by the Lutheran church, of which he was a member. The son dies, and the grandchildren, Thone Salemonson and Charles O. Myron, continue to care for the grandfather and fully carry out the agreement made by their father with him. For a period of over 17 years there was no move whatever made to set aside said conveyance or to disturb in any manner the relation of the land in question. So far there would appear to be nothing unnatural in the transaction or anything which would be suggestive of fraud upon the part of the son, Ole Kittelson, in getting the deed. No brother or sister up to this time has been heard to suggest in any manner or form that the deed was not of binding force. When Ole Kittelson died, his estate was probated in the usual manner, and the title shown to be vested in Thone Salemonson and Charles O. Myron. There was no suggestion that these proceedings were carried on in any secret manner whatsoever, and, indeed, from the conditions surrounding the entire transaction, everything appears to have been done in a natural and orderly way. Not until an unfortunate act occurs, when it appears that Charles O. Myron committed a great wrong upon Julia Thompson, the defendant in this action, for which he was sued, judgment secured, and his interest in said land subjected to the payment thereof, do we approach the first suggestion that Kittel Olson was insane and his deed

.should be avoided. This appears through an action which Thone Salemonson began, and through which it is shown that a fraud was attempted to be perpetrated upon Julia Thompson by the said Charles O. Myron in transferring his half interest in the land to his sister, hoping thereby to escape liability under the suit against him. This action was prosecuted, and this court, in the case of Salemonson v. Thompson, 101 N. W. 320, 13 N. D. 182, held that the acts of said Myron were in fraud of Julia Thompson, who was declared to be the owner of the half interest of Charles O. Myron in said land. Failing to secure the land by this means, they now go back to a transaction had 17 years previously, and by attempting to prove that the grandfather was insane, or at least not competent to give his deed, they seek to attack the bona fides of the original transaction which had rested in such apparent security for so long a period of time. A simple statement of these surrounding circumstances would suggest that, before the court should aid these plaintiffs in what must be their evident design, it should be convinced by evidence that is clear, satisfactory, convincing, and of such a character as to leave the mind of the court with no hesitation or substantial doubt that the facts contended for by the plaintiffs, and upon which they expect to have the deed declared void, are true.

Twenty-two witnesses were sworn. The larger number of those who testified for the plaintiffs were relatives and personally interested in the outcome of the litigation. Two or three witnesses for the defendant were likewise related in some manner to her. It is very clear from a reading of the testimony that all the witnesses who were related to one side or the other were largely influenced, and their testimony was highly colored by virtue of the fact of such relationship. The testimony of the plaintiffs went but very little into detail, and its greatest strength lay in the fact that it was their opinion that the ancestor, Kittel Olson, was non compos. This opinion comes from a class of witnesses who have for 17 years remained silent with reference to their ancestor's diseased state of mind, and now, in order to accomplish the purpose of setting aside the deed suddenly arrive at the opinion which they announce. As was stated above in the rule with reference to opinion evidence, "their bias is an obstacle which hinders in the investigation of the truth;" and, while the court permits this testimony to be considered, yet it does not believe that it rises to that

high state of credibility which leaves any lasting conviction up-
on the mind of the chancellor, and that it should not be allowed to
control over as against certain other testimony which appears
to show that the ancestor did have a sufficient capacity to transact
the particular business of giving the deed.  We find Kittel Olson,
though paralzed in his speech, sufficiently able to make his wants
known, could quite largely care for himself by way of dressing,
and otherwise, could make intelligent answers, 'Ya' and 'Nay' gen-
erally, although sometimes it would appear from the evidence that
he became involved in his answers, not, however, to the extent that
we should conclude otherwise than that there was a misunder-
standing between him and the person who asked the question.  And
we further find him in the care of a son, between whom and him-
self and the other members of the family there does not appear to
have been any unfriendly feelings.  We find him simply giving the
deed, after having been requested to many times, to his son, in
order to provide for his future care and protection during the
remainder of his life.  He is not dealing with third parties who
might take advantage of him, but is transacting business with those
in whom he could put his trust, and it is very clear from the manner
in which he was afterwards cared for that his trust was well found-
ed.  When, however, we approach the testimony of the witnesses,
who, like Mr. Broton, were wholly without interest in the case, we
find that in their opinion the deceased Kittel Olson was competent
to make a deed.  S. O. Broton, aged 53 years, a minister of the
Gospel, had known Kittel Olson since 1885 or 1886.  He lived 1½
miles from him for a time.  He saw him first in 1885, after the
paralytic stroke, and was his pastor.  Kittel Olson  was  present
when the congregation in that vicinity was organized.  The witness
makes answers to questions as follows: "Q.  What was his condi-
tion when you first got acquainted with him?  A.  He was in that
condition as he was after he got the paralysis.  Q.  Just describe
to the court, Mr. Broton, as well as you can, how his physical con-
dition was?  A.  They sent for me that I should come and give
him the Lord's Supper, the sacrament, and I have to examine every
man when they are in that condition, that they can take it, because
we in the Lutheran Church give only the sacrament to grown
people that have their senses, that they know what they do, so when
I came there I had special reason to examine him.  Q.  You knew
that he was in this condition?  A.  Yes; I knew that and the first

time I examined him the best I could, but he couldn't talk, he couldn't say more than 'Ya, ya,' and 'Nay, nay,' and if he tried to say any more, that would be another kind of sounds as you have heard here, 'ah, ah, I, I.' That is when he tried to talk more than 'Ya' and 'Nay.' Q. His vocal organs were apparently paralyzed? A. Yes. I asked him if he knew what the sacrament meant, and if he knew what he was doing when he got the sacrament. He tried to talk, but he couldn't. So he went over to a shelf and took out the Lutheran catechism, and he found that very part there about the sacrament, and showed me, and I couldn't think any person could make himself understood better than that when he have not his power of speech. Q. So did you administer to him the rite? A. Yes; I sang to him hymns and I talked to him as I use to when I give the sacrament to any. Q. Prayed for him? A. Yes; and he seemed to understand it by his feelings were going after what I said. When I talked about his sin, he cried, and when I talked about the joy of the Gospel of the Saviour of Christ, he seemed to enjoy that. Q. You think he understood everything you said to him? A. It seems to me he did." The witness further testified that he frequently administered the sacrament after that, and that the same was received with like understanding. The following question was asked: "Q. Well, what was your opinion as to whether or not he understood at all times what was going on? A. He understood what I had to bring him, and I didn't talk about anything else. Q. What impression did you get of the man as to his mental condition generally? A. I think he had his mind, except he couldn't talk, couldn't make himself understood. Q. Did you ever see him read, except that time he took up the catechism? A. Yes; he took the book and opened it and found that place, and just pointed to the place with his finger, and so I suppose he could see and read. Q. From your examination of the man and your dealings with him, extending over those many years, did you think the man was sane or insane? A. I think he was sane. Q. You think he had a notion of what it was to give a deed to property? A. Well, if they talked to him about business or deeds, he could understand that as when I talked to him about the communion he understood that, but I didn't talk business to him at all." In view of this very positive testimony from one who was an entirely disinterested witness, and who was in the position and required by virtue of his office to inquire

into the condition of a man's mind before he could administer the sacrament, it would seem that while the person could not talk, yet that the mind was still active. It would not require a very large amount of reasoning capacity to make a contract with one situated as was Kittel Olson at the time in question, and we are convinced that he had sufficient intelligence to make this deed.

The decision of the lower court is therefore reversed, and that court is directed to enter judgment in favor of the defendant, Julia Thompson, quieting title in her as to an undivided one-half of the land in suit.

SPALDING, J., concurs.

FISK, J., having tried the case below, took no part in this decision; HON. CHAS. A. POLLOCK, Judge of the Third judicial district, sitting in his stead.

MORGAN, J. (dissenting). I dissent from the conclusion reached on the question of fact as to the competency of Kittel Olson to make a valid deed. In my opinion the evidence conclusively shows him to have been incompetent under the rule announced in the opinion of the majority. No useful purpose will result from a discussion of the evidence on which I reach my conclusion.